The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this honorable court. Good morning, Mr. Riley. Thank you, Your Honor. It may have pleased the court. I'm Richard Riley on behalf of the City of Virginia Beach and the other defendants. The claim before the court this morning is a voting rights act coalitional claim without a coalition. A coalition did not come to court and a coalition was not proven to exist. As the Sixth Circuit correctly held, Section 2 of the Voting Rights Act is not properly read to recognize these claims. But even if this court holds otherwise, this particular claim still cannot succeed. In short, the plaintiff's claim fails at every step and the judgment below should be vacated or reversed. Let me begin with the question of jurisdiction. The plaintiffs are incorrect to argue that the city's appeal is moot. The mootness question turns on whether a, on appeal, the appellate mootness jurisdiction question turns on whether a district court judgment or injunction is imposing a continued injury in fact that is appellate powers. The answer here is yes. The district court's injunction requires the city to utilize a redistricting plan that the city has not adopted and against the city's will. So it's your position that the case is moot but the appeal is not. Is that correct? That is correct, Your Honor. The plaintiff's claim is moot because that turns on the challenge system, whether that is imposing a continued injury in fact. By contrast, the appellate mootness jurisdiction question turns on whether the judgment below and the injunction is imposing an injury in fact. Can I ask you a question about the case being moot? And I think I understand your position on this. But this, I guess, is my question. If I were trying to figure out why maybe it's not moot, this is where I end up. So the district court found that at-large elections in this district, because of block And if that's right, then what about these remaining three seats that are at-large? Don't they also violate Section 2 so that we could provide relief by affirming the district court's plan? The answer, Your Honor, is we certainly do not know that. That's not how the Voting Rights Act analysis works. Under Johnson v. DeGrande, Jingles, League of Latin American Citizens v. Perry, multiple cases hold that it's a comparison of the number of opportunity districts in the challenged plan as compared to the number of opportunity districts in a remedial plan, a proposed illustrative that is provided by the plaintiffs. So what the district court held precisely, and you see this very vividly at Joint Appendix 1146 and 1154 through 55, was an 11-member scheme. I think it's more properly viewed as a 10-member scheme, but they're all at-large seats in any event. And the district court effectively believes and holds that there's no opportunity districts in that system. But a system with three at-large seats is fundamentally different because there are seven remaining seats. Well, we don't know what those are. We don't know if they will perform as opportunity districts. They don't even exist. That argument isn't right. And it's significant, of course, that the district court's opinion doesn't say anything about a 7-3 system. It doesn't say that wouldn't work, that would violate Section 2, and of course it's in no position to do that. What the district court's decision focuses on, of course, is the plan that was identified in the complaint, all the evidence concerned that plan, and that plan is no longer in existence. So you see an advisory opinion opining that a system that will never be used again is violative of Section 2. The law is clear, including this court's Valero Terrestrial Corporation case, the Esposito case, the Supreme Court's New York State Rifle case, that any argument that the plaintiff may have in the future about this future 7-3 system, whatever it may be, can and must be brought in a new case against that system. With that, I would like to turn to the merits, if I may. Obviously there's been a lot written by distinguished Article 3 jurists on the question of coalitional claims in Section 2. I'm only going to add so much this morning. I want to take a few minutes just to clarify our position, because what you see in the plaintiff's and their claim that we are not making. Our position is not that Section 2 of the Voting Rights Act protects only one minority group at a time. Our position is that in a coalition claim you have a fundamentally different problem, because none of the groups standing alone, none of the voters standing alone, can allege that they are denied or abridged in their right to vote on account of their personal race or color. It's only by viewing all of these groups together that the coalition claim comes into existence, and that's what makes these claims difficult under the statutory language. I think the crux of the matter is that the plaintiffs and their amicus want to read in a white, non-white distinction into the Act, and they want the Act to say, on account of not being white. But that's not what the Act says. It says, on account of race or color, and that's personal to the voter. And Congress, in fact, knew how to say... So is it your position that to have standing at least one person of every race in the minority community would have to join the lawsuit? That is our position, Your Honor. That's our third-party standing argument. I apologize for skipping over it. I'm trying to get to as much as I can. But our position is very between the claim and the people who are bringing the claim. This is a coalition claim. I think it's a modest proposal. Yes, Your Honor. Is your third-party standing argument, I mean, that collapses into your merits argument about the coalitional claims, doesn't it? If it were permissible to bring coalitional claims, then why wouldn't it be sufficient that you have one plaintiff in the coalition? I understand how it does dovetail with your merits argument, but are they really separate arguments? I think they are in the relevant sense, right? We're not... For purposes of third-party standing, we're assuming that there is a claim that's cognizable. We're assuming they can even prove it. That's not what we're saying. We're not challenging the merits, but according to Flass v. Cohen and many other cases, there is an analysis looking at what the claim is to see if that person is the right person to be bringing the claim. A coalition claim still recognizes, even on its own terms, assuming it's valid, assuming it can be proven, it's still recognizes that there are different groups. We know this because GROW, the Supreme Court said so in GROW, it said these are distinct groups that are coming together. A coalition means you have different groups at the table. Everyone's represented. Everyone's present. And the problem here today is that we are litigating a claim about the rights of persons of Asian-American and Hispanic voters. That's their voting rights. That's personal to them. But we're litigating them, and they're not here. They're not represented. Would it be any more representative if just one person from those groups was the person who bought the suit? Is it really practically any difference? You're saying that it's resolved if you had one person from each of the constituent minority groups, that would solve the problem and that would be more representative? Because one Hispanic person bought the suit, then it would speak for it. Who has to bring it? Everybody? The statute says any citizen singular. Does it not? I'm not — I agree with Your Honor. Okay. Well, I'm just trying to understand. You said how do you cure it? You said we need each person. I thought in response to Judge Thacker, you were saying you needed each person from the constituent minority or race or color class has to be there. You're not saying — clarify that for me. Thank you for allowing me to clarify. I'm not saying every voter has to be brought. I'm not saying it has to be a class action lawsuit. What I am saying — I didn't say every voter. I said one person from that group. Are you saying that? And I agree with that. That is our position. So you are requiring that? Yes. And I think that — Well, how is one person any more representative than another minority person who has found here has also historically and present still has a sting of discrimination and blocked voting? The same way that one person makes a difference in a single race claim. Two voters — But the difference is the proof. As Judge Harris was saying, are you conflating the ability to have standing to bring the suit with the merits of whether or not you can show cohesiveness and all those things? It doesn't mean, you know, you made it through, but you bring under the statute any citizen, it says. And then, of course, you have to show cohesiveness and all of those things. And then you rightfully say, well, how do you know that? Well, how do you know that? As you have done here. But you're saying ab initio, a coalition claim cannot be brought. Is that right? That's our third-party standing position. We have — we're arguing all of it, right? I mean, we are challenging on the merits. I'm about out of my time, so I'll try to get to cohesion and rebuttal. But that is our position, and I think this goes to the fundamental problem that the Fifth Circuit recognized in Lulac v. Clements. And I say I'm getting to my rebuttal time, but I'll just say one more word about this. In Lulac v. Clements at footnote 33, it acknowledges that these claims can have problems. They may not actually have other groups' interests in mind. We have a very modest proposal that you need a coalition to bring a coalition claim. Thank you, Your Honors. Thank you. Mr. Malley? Ms. Malley? Thank you, Your Honor. And may it please the Court, Eric Malley, on behalf of the Commonwealth of Virginia, representing the amicus. I'd first like to briefly address the argument that the appeal is moot. The Commonwealth agrees with the city that its compliance with the injunction pending the appeal does not moot the appeal. And under the Virginia Voting Rights Act, the fact that the city obtained preclearance of the plan that the district court ordered would not bar the city from now seeking to adopt a new plan, and it would simply have to obtain preclearance of any new plan under the same standards. Turning to the merits arguments, the circuits are split as to whether counsel— Counsel, I'm sorry. Before you leave mootness, can I just ask you a couple of questions? So the city's position is that under state law, it's really impossible for it to revert back to an all-at-large election system. Is that your understanding also? We hadn't actually weighed in on that precise mootness argument in our briefing, but I believe we agree with the city's position on that. Was passage of HB—is it 2198, the law that the city believes has mooted out this case—was passage of that law at all related to this litigation, do you know? I can't make any representations about that. I'm not aware of the history of that act one in 2021. On the merits of the claim, the circuits are split as to whether coalition claims are cognizable at all under the Voting Rights Act. However, every circuit that has allowed such claims has also required a heightened showing of cohesion, that each group within the purported coalition is cohesive and is cohesive with the other groups. That follows from the Supreme Court's holding in Groh v. Emison that if coalition claims are cognizable, a question that the court expressly reserved, then a heightened cohesion showing is obviously required. Here, the district court instead erred by not applying a heightened standard and analyzing the cohesion of the purported coalition only in the aggregate. Without a distinct analysis of each group in a purported coalition, such a claim threatens to create by judicial fiat the very type of harm that the Voting Rights Act was intended to prevent, thwarting the voting preferences of a distinct minority group by submerging it within a larger group of a different race that has different voting preferences. That risk is not only a theoretical one here. The very evidence that the district court relied upon to find cohesion in fact strongly suggests that that is what occurred. Counsel, I'm sorry, can I just take you back to what you said before? Just in practical terms, what is the harm on your theory? What is the harm to Hispanic and Asian voters here? Well, if Hispanic and Asian voters in fact have different voting preferences than the black voters do, they're a much smaller element of the minority coalition. But so what? I don't understand. Does it hurt them to be put in a district with black voters? It could, yes. You could be essentially diluting their vote. Well then they can bring a claim, right, and say my vote has now been diluted, I've been cracked and packed or whatever. Is there any reason to think that they're... I don't understand. What would a claim like that look like? Well, we're not saying that they would necessarily have a claim because they wouldn't... So what is the harm? The harm would be that otherwise they might have been in a different district with a greater chance of achieving their voting preferences, and instead you're putting them in a group... That's always the case. Every time they redistrict my state, I might have been in a different district where I would have a greater chance of bringing to pass my voting preferences, but we don't usually think of that as an injury to a voter. You might be, but you're purportedly remedying a thwarting of their voting preferences. But if they don't share the voting preferences of the coalition, you're not. You're actually thwarting them because... What is this, like a dignitary injury, like they've been harmed because someone is making assumptions about how they vote? You're certainly — there is that, but you're certainly not remedying any dilution of their votes... But how are you thwarting that? ...because they have different voting preferences. I understand. I understand that on your theory you are not remedying any dilution of their votes, but I am not catching or I'm not understanding the part about you seem to be suggesting that they would be actually in a concrete way injured if this were the case. I'm trying to get my hands around what that looks like. They could be if in the ex-anti world they would have been in a district that reflected their voting preferences, and now they're in a district that does not. But we're not saying they necessarily would themselves have a claim. We're saying that a coalition claim where there is no showing that the different groups within the coalition are cohesive, you are not actually furthering the purposes of the Voting Rights Act. Thank you, Your Honor. Thank you, Mr. Maynard. Mr. Lamar? Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Chris Lamar appearing on behalf of Plaintiff Appellees. This Court should reject the City's appeal for three reasons. First, the parties agree that this appeal is moot. Second, the district courts, factual findings, and ultimate conclusions— I don't think the parties agree that the appeal is moot. Well, Your Honor— You just argued it's not moot. Well, Your Honor, in their— The case is moot. Your Honor, in their reply brief, and this sort of gets to Judge Harris's question that she asked earlier about the HB 2198 measure, the City abandons the argument in their reply that HB 2198 is what makes this case moot. Instead, what they say is that HB 2198, combined with the broader protections under the Virginia Voting Rights Act, is enough to make this case moot. That's not quite right. We agree that the Virginia Voting Rights Act is the key measure here, and that is because the Virginia Voting Rights Act has several requirements that the City has to comply with that are separate from Section 2. And to comply with the Virginia Voting Rights Act, the City submitted for preclearance the 10-1 remedial map from the district court. And the Attorney General granted preclearance in part because the remedial map includes three opportunities to elect districts. The last part here that's important is that the Virginia Voting Rights Act includes a retrogression component. And what that simply means is that once the City takes a step forward to protect the minority community's voting strength, it cannot then take a step back. And you know what, Mr. Lamar? I interrupted you when you were doing your three reasons. If you want to go back to those. I'm happy to continue talking about mootness. Can I ask you a question about mootness? Because it does seem to me, Judge Thacker, of course, is right, that one of you at least mostly is arguing the case is moot, one of you is arguing the appeal is moot. But either way, you both agree we should not be hearing this case. And it seems to me that the result would be the same either way, that we would have to vacate the district court order because the City, through no fault of its own, has now been deprived of the right to appeal not only a judgment against it, but an actual federal court injunction managing its elections. So why does it matter which theory of mootness we're using if it's going to end up in the same place? Well, Your Honor, the parties here haven't briefed the vacator issue. I think it might be helpful for this Court if the parties engage in further briefing on this issue. But even turning to the law on this case, the Supreme Court has held that vacator turns on the specific facts and circumstances of each case. And the public interest here in terms of the presidential value of the district court, the well-reasoned district court order about Section 2 claims for coalitional claims, for example, is very valuable. I think, secondly, Your Honor, in the remedial phase, the City had ample opportunity to submit a non-dilutive map to the district court that would comply both with Section 2 and the Virginia Voting Rights Act. In the remedial phase, and the City doesn't discuss this, but in the remedial phase, the City submitted to the Special Master a seven-district plan that the Special Master described as being wholly insufficient in remedying the violation. So not only did the City have the chance to submit a plan that wouldn't dilute the minority community's voting strength to... But by the time the district court entered its order, the case was arguably already mooted by the change in the Virginia law, wasn't it? I think that's possible, Your Honor. I think our concern here, quite frankly, when we're discussing when does this case become the question, quite frankly, of attorney's fees and when is the City responsible for paying attorney's fees in this case. But in terms of Virginia's law didn't outlaw at large, did it? No, that's right. How would it have mooted it at all? Well, that's sort of in our views. In your view? That's just the amount of fact. Yeah. The law, the VVRA does not outlaw at large at all. Right. It says if you have a residential requirement, but that's not required. Yeah, and in our view, it is once the City actually took the affirmative step to comply with the broader requirements under the Virginia Voting Rights Act, which was when they submitted the map for preclearance to the Virginia Attorney General, and then the Virginia Attorney General granted preclearance, in part because of the three opportunity districts. To us, that is when the appeal became moot. The plaintiffs in this case are not asking for the 10-1 remedial map. What the plaintiffs in this case are asking for is the removal of the vote dilution that is happening in the City of Virginia Beach. Because of a separate statutory regime under the Virginia Voting Rights Act,  that continues to dilute the minority community's voting strength, regardless of what happens with the Section 2 component. And so because of that, the City's appeal is moot because it can no longer revert to a system that continues to dilute the minority community's voting strength. I guess I'm not—so it's your position that once this plan has been— the District Courts Remedial Plan has been precleared under the Virginia Voting Rights Act, we have to assume for mootness purposes that the City prevails on appeals. So you're saying even if we said the District Court order was wrong, it's reversed, the City would not be authorized to bring a new plan before the State under the Virginia Voting Rights Act. It couldn't try again to get a new plan approved. It's not—the City may be able to submit a new plan, but the plan that the City could submit would still have to give the minority community at least three opportunities to elect the candidates of their choice. And that's because the Attorney General included the three opportunities to elect component in his letter granting preclearance. Well, maybe that will be this plan. It'll have seven single-member districts. And as your colleague said, we don't know. Maybe three of those will be opportunity districts. Well, for the plan that the City is referring to, we do know that that seven-residential district plan would not remedy the violation. That's because the City submitted a seven-residential district plan to the special master in this case, and the special master described that residential district plan as being wholly insufficient in remedying the violation in the remedy phase. And then in the final order, the District Court adopted the special master's conclusions in this case. But we don't know what plan the City would submit. I guess I'm just—it just seems very hypothetical. What if the City submitted a plan that it could get precleared but was still different from the District Court one? Well, Your Honor, I think the— Or what if—are we 100% sure? Is it 100% a done deal that the State couldn't say, look, now that the Fourth Circuit has reversed the District Court order, we think the baseline for considering the non-retrogression principle is the original plan, not the District Court's remedial plan. And so long as it's better than that, we'll take it. Well, Your Honor, it's not clear that there is an original plan in this case, right? HB 2198 removed the original system that the City was using in this case. And so what we have here is—what we have here in terms of, as far as the State is concerned, the original plan in this case is the remedial map. And if we're going from the remedial map, the State has said you can use this map to elect City Council members in part because it includes three opportunities for the minority. But why wasn't it mooted before the remedial plan was put in place because of the new statute that I thought I just heard you say provided a new electoral structure? Well, the statute, as we argue in our briefing, the statute itself doesn't moot this case, and that is because the statute doesn't dictate how the lines are drawn. Well, I'm looking at your demand for relief in your amended complaint at JA-61. What—which of those demands did the change in the Virginia law not satisfy or not moot? Well, it doesn't implement a system that doesn't dilute the minority community's voting strength. And it doesn't guarantee that the minority community's voting strength would not be diluted, which is the issue. The plaintiffs in this case weren't just asking for the removal of the old system. Right. So is that A, B, C, D, E, or F in your demand for relief? I don't have the complaint in front of me, Your Honor, but I think ultimately because the plaintiffs aren't just asking for the removal of the old system, we're also asking for the implementation of a system that does not dilute the minority community's voting strength. But you don't get the implementation of a remedial plan until there's been a violation. And so what I understand the city's argument to be is the district court held what I'll just call the original plan, the ten at-large seats, seven of which had residential requirements. That dilutes votes impermissibly under Section 2. But what we don't know is whether the new plan dilutes votes impermissibly under Section 2. And I think there really are questions about that. One of the things the district court relied on, it wasn't just that these were at-large seats. It's that they were at — seven of them were at-large residential seats. And the district court thought that was particularly problematic in a way that an actual at-large seat would not be. We don't have any of those anymore. We have these seven single-member districts. We don't know exactly what those will produce. We don't even know exactly what the lines are yet. So it does seem hard to me to say that the district court's ruling as to the old plan kind of necessarily transfers onto this new one and calls this one impermissible also. Well, Your Honor, the reason — and I think the reason why we're calling it impermissible is because, again, in the remedial phase, the city submitted at least one seven-residential district plan. And the special master in that case at that point in time found that seven-residential district plan to be wholly — to be insufficient into remedying the violation. I can continue to talk about mootus, but I'm also happy to move on to standing or the merits in this case. As it relates to standing, I agree with both Judge — sort of the questions that Judge Harris and Judge Gregory were asking in terms of the racial purity test requirements that the city appears to be imposing here. And that's quite simply because the city is misstating what the plaintiffs are alleging in this case. What plaintiffs are alleging for standing purposes is that they're members of a cohesive minority community whose voting strength is being diluted. They're bringing this claim on behalf of themselves as members of this cohesive minority community. The city makes this argument a little — repeatedly that a coalition claim requires a coalition of plaintiffs. They say this sentence almost explicitly on page 5 of their reply brief. But notably, they don't have a citation for that. And that's for a good reason. No court has ever held that a coalition claim requires a coalition of plaintiffs. The — on the other hand, district courts, for example, such as the Kumar case, has noted that an individual plaintiff in a coalition claim — an individual plaintiff may bring a coalition claim, and then they must, of course, prove that they're members of this cohesive minority community and that this minority community is authoritative. What's your response to opposing counsel's argument that plaintiffs are litigating rights for others who aren't a part of the lawsuit? Well, I think they're just simply wrong about that, right? And this goes to their — when they're bringing this third-party standing argument. You know, some of the cases that they cite, for example, I think it's the Nordgren case, which is a Jewish white woman was bringing claims on behalf of black attorneys, I think, in Mississippi. That's not the case here. The plaintiffs in this case are suffering the same statutory harm as the Hispanic and Asian members of the Virginia Beach community. And that's just simply the problem here, is that everyone is — although the entire minority community is suffering the same harm here. Turning to — you know, turning to the sort of merits question as to whether or not Section 2 recognizes coalition claims, the majority of circuits have recognized this. The Supreme Court has said in multiple cases that civil rights statutes such as Section 2 should be read broadly. And reading this broadly here, a class of citizens protected by subsection A simply means that the class has to be composed of plaintiffs who are suffering the same harm. And in the city of Virginia Beach, the class of citizens who are suffering this harm are a cohesive minority group of Hispanic, black, and Asian voters in the city. In terms of the determining whether or not if the coalition claim — if the coalition is actually cohesive, the district court engaged in an exhaustive analysis and factual findings to make its ultimate conclusion, which was that the minority community is. And the reason the judge was able to do this was for — on two bases. First, on the quantitative side, where the district court relied on plaintiff's expert, Dr. Spencer, and it also relied on the special master in this case. There's a lot of statistical analysis that is happening, and there are a lot of numbers being thrown around. But there is one basic fact that is true, and that I think quite neatly sums up why the court was able — on the quantitative side, why the court was able to find that the minority community was politically cohesive. And that is, as the minority community's population increases in a precinct, so too does the support for the minority-preferred candidate across all three statistical measures. And so being able to look at this, the district court looking at the statistical evidence that Dr. Spencer did, relying on the findings that the special master made, the district court was able to conclude that the minority community was politically cohesive on the quantitative basis. But the district court didn't just look at — Can I just — just for clarification. So your read is that the district court found that on the quantitative evidence, there was statistical evidence of minority group cohesion. Did the district court find that that statistical evidence showed that there was, I guess what your counterpart would say, sort of within the coalition there was cohesion, that Hispanic and Asian voters more likely than not were tending to vote the same way as black voters? Yeah. Yes, Your Honor. What Dr. Spencer said in his testimony is simply, as the — if the — if Hispanic and Asian voters weren't voting similarly to black voters, you wouldn't see the continued support in the growth as the minority community's population in the precinct increases. And this is one of the — this is kind of one of the important issues here is that, you know, of the minority community, which is about 38 percent of the city of Virginia Beach, black voters compose about 53 percent of that number. But that's not necessarily the allocation of the minority community in each of the precincts that the experts are looking at. And so, you know, if we're seeing, as Dr. Spencer says, if we're seeing the increase in support as the population increases, then it's reasonable to infer that the Hispanic and Asian communities are supporting the — are supporting the same candidates as the black voters. There's one other thing that I sort of want to point out here is that the parties engaged in — also engaged in the exhaustive briefing during the remedial phase. Throughout the briefings in this case, before this court, the city doesn't cite the remedial briefings at all. And the reason for that is because the remedial proceedings actually demonstrates that the minority community continues — that the Hispanic and Asian voters continue to vote in concert with the black voters. And you can look at Dr. Spencer's — Dr. Spencer discusses this in the record at SJA 171 to 173. And, you know, even if we turn to the qualitative evidence in this case, the district court looked at what the — as the Fifth Circuit said, one of the ways to use qualitative evidence to determine if the minority community is politically cohesive is by looking at the common social, political, economic, and social bonds. The district court spends about 20 pages discussing all of this history that the minority community engages in in the city of Virginia Beach. The city, on the other hand, tries to — and I think this is a good example of the problem, quite frankly, with their entire argument, which is that they take cherry-picked evidence and apply it to a narrow interpretation of the law, where they say, well, no, qualitative evidence must demonstrate voting patterns. The Fifth Circuit hasn't held that. Multiple courts haven't held that. The — I believe it was this court in the Levy panel held that one way to — another way to show political cohesion was demonstrating common aims and using — having common aims and using — or having common goals and using common aims to achieve them. And so looking at the evidence in this case from the fighting for single-member districts, the minority community advocated together in protest when city officials made derogatory remarks about Asian members of the community. They protested against Confederate monuments in the city of Virginia Beach. That demonstrates that the minority community is politically cohesive. But even if we use the city's narrow interpretation of what qualitative evidence can demonstrate voting patterns, I think there are two key facts here. The city presented two witnesses, a Hispanic American by the name of Mr. Benito Loyola and a Filipino American by the name of Mr. Noni Abrahano. Both of them testified that those — that the — Mr. Abrahano, for example, testified that the Filipino American community supported the 2018 candidates that Dr. Spencer found to be the minority-preferred candidates. And Mr. Benito Loyola testified that the minority community was cohesive in his experience. And you can see those sites at JA0811. And you can see — you can see Mr. Loyola's site at JA0811. And you can see Mr. Abrahano's site at JA0871. But even if we put the city's — these two witnesses aside, the city itself recognizes that the minority community is politically cohesive. And we know this because in the 2011 cycle, the city tried to create — tried and failed, might I add — tried to create a majority Hispanic — majority minority district composed of Hispanic, Black, and Asian voters. And so looking at all of this evidence holistically, which is what JINGOS requires and which is the requirement for the district court, looking at all of this, the district court did not clearly err in finding that the minority community was politically cohesive. I'm also happy to, you know, talk about JINGOS 3 or if there are other questions — if the panel has other questions, but otherwise I'm happy to seek the rest of my time. Thank you, Mr. Lamar. Sorry, for the foregoing reasons that we would — for the foregoing reasons as discussed today and in our brief, this appeal is moved. Alternatively, this district court's order should be affirmed. Thank you. Thank you. Mr. Rowley. A few rebuttal points beginning with mootness. It is absolutely not true that the plaintiffs have abandoned their reliance on HB 2198. On page 2 of our reply brief, it says the case, quote, is moot because HB 2198 forbids the city from using the at-large system. Mr. Lamar also said that the Virginia Voting Rights Act doesn't prohibit at-large voting. That is correct, but HB 2198 does. That's the statute that moots this case. Mr. Lamar also said that — I'm sorry. What do you mean by HB — I'm sorry. I can never remember the number. HB whatever prohibits at-large voting. I thought there still was going to be at-large voting for three seats. Correct. For this — for the seven residency districts, they have to be used as single-member districts. There's no possibility of going back. Your Honor, I asked about whether, you know, the circumstances related to this case. There's certainly no evidence on the record of that. I certainly understand that there were at least some members of the city council who did not want that change. It's not some sort of coordination with the General Assembly. There's no evidence like that. I'm quite confident that did not happen. This is like the Catawba River case. And that leads me to the question of vacater. As Judge Harris suggested, it would be the case that the outcomes would be the same in terms of vacater. The rule is that if the appeal does become moot, vacater is the proper remedy unless the defendant is responsible for that. But in the Catawba River case, this Court made very clear, and relying on other cases like the Valero terrestrial case, that where the state legislature does it, another entity of the state is not deemed the same party. Does this perhaps lead to a supremacy clause-type problem in the sense that aren't you saying that the state could preempt federal law? Because, I don't know, the whole thing you talk about with the purpose of the 1965 Voting Rights Act was required and necessary because of what states were doing. And here you're saying that a federal court comes down with that finding of discriminatory plan, going through the process, drawing up a plan. And now, because the state has a statute that moots this, because if it's moot, then that would follow that it's vacated because the case law says you're not voluntarily doing it. You came kicking and screaming when you submitted this plan. You agree with that, don't you? Yes, Your Honor. Right. It was a shotgun wedding, if you will, when you came to the table. And you likewise can go back, when you go back and change, there's nothing that prohibits you from getting rid of residency completely and have totally at large. That is not correct. What would prohibit you? The state law. So you can't, the state law says. Yes. I thought the state law says if you have a residency requirement, if you do. And state law also says the city of Virginia Beach has to have a residency requirement. There is no option. Virginia Beach. Because of what? Because of the charter? Because of the charter? Yes. Well, I know you've got the Dillon rule, but you can't propose to have that changed? General Sims, as we know, change and the executive and the legislative, that changes as elections change. This court addressed that. But the right for people to vote without discrimination should not change in this country, correct? I agree with that. You agree with that? I also agree that the right under the Second Amendment shouldn't either. But the U.S. Supreme Court in the New York state rifle case said that a challenge to a state gun law under the Constitution, the Second Amendment, was moot because of a change in the law enacted by the state legislature of New York. And, in fact, in that case, the dissent believed that that was part of the purpose of the statute, was to moot the case. And the Supreme Court said that doesn't matter. They've got to bring their claim against the new plan. And that's the same case here. Section 2 doesn't go away. Well, the big difference is the Second Amendment is quite different than the purpose of the 1965 Voting Rights Act. The Voting Rights Act was that just clearly black people were just discriminated and they were disenfranchised systematically. I'm aware of no authority that says the Article III jurisdiction of the federal courts turns on the nature of the substantive claim. The analysis could involve a look into whether there is bad faith. There's nothing like that here in this case. And it is moot. I see that my time is out. We would respectfully ask the court to vacate or reverse. Thank you. Thank you, counsel. We would love to come down and shake your hands, but we're still under protocol for COVID, and we can't do that. But, nonetheless, we appreciate your arguments. Thank you for being here today. We appreciate it. Hope that you all be safe and stay well. Thank you.
judges: Roger L. Gregory, Stephanie D. Thacker, Pamela A. Harris